MYRON H. SMITH v. PETER WALKER, AND JAMES H. IMUS.

*Final order—Infringement of trade marks—Partnership interest—False representations—Equitable remedies—Rehearings.*

1. An order is final which enjoins defendant from ever using a particular device upon his manufactures, or from selling them as if made at complainant's establishment.

2. A decree which grants the principal relief prayed for, and gives complainant the immediate benefit of judicial action by an injunction that in effect puts an end to defendant's business, is appealable, even though a farther decree may be necessary upon completion of an accounting.

    *Enos v. Sutherland* 9 Mich. 148, in which the accounting precedes the main redress, is distinguished.

3. Redress for the infringement of a trade-mark, must be had at common law, if the trade-mark is unregistered and if no application has been made for its registration.

4. A trade-mark, at common law is any peculiar device or symbol, whereby any dealer may distinguish his goods from another's; he secures the sole right to use it by prior adoption, by the publication of it as his own, and by exclusive sale. But it cannot be a mere designation of a quality, the name of a place, nor a description of the article in ordinary language.

5. Oral testimony as to the terms of a copartnership agreement is inadmissible, where the terms are contained in written contracts.

6. An agreement which purports on its face to be a copartnership agreement and which provides that the parties thereto shall share equally in expenses, losses, and gains, cannot be treated as a mere contract of employment.

7. A partnership trade-mark may be an important element in the good will of the business and is an asset of the firm which can be sold or disposed of, on its dissolution. But if not disposed of, each partner has a right to use it, if he continues in the business, unless it has been otherwise agreed.

8. Each member of a firm that has been dissolved has a right, unless otherwise provided, to continue in the business in competition with the other, so long as neither can be held on the other's contracts.

9. There is a remedy at law against a business rival who injures his competitor by false representations, such as that he is dead or gone out of business, or that the former's goods are the same as the latter's.

10. Matters in aggravation are not to be considered where the main case fails.

11. Whether the label "Smith's Grain Grader and Seed Separator" can be treated as a trade-mark—Q.

12. False representations are a basis for equity jurisdiction, only where the resulting injury is not remediable at law.

13. Rehearing will be denied unless the Court's attention is directed either to a misapplication of the law, or to something in the record or briefs that has been overlooked and is material to a proper disposition of the case.

Motion to dismiss appeal. Submitted January 27. Denied January 29.

*L. A. Tabor* and *H. F. Severens* for the motion.

*Geo. W. Lawton* and *Edward Bacon* against.

PER CURIAM. Motion to dismiss an appeal in chancery on the ground that the decree appealed from is not a final decree.

The decree perpetually enjoins the defendants, their agents and servants " from marking, painting or stenciling for sale, and from selling fanning-mills marked, painted or stenciled in imitation of the complainant's fanning-mill and from *using* upon fanning-mills *manufactured or sold by them, or either of them* the words 'Grain Grader & Seed

Separator, Lawton, Michigan,' in imitation of complainant's fanning-mills and *from selling or offering for sale* fanning mills not manufactured at Lawton, Michigan, in whole or in part as and for the Lawton·fanning-mill, and from and in every manner representing the complainant to be dead or out of business, or that they have succeeded him in business." It also orders a reference to a circuit court commissioner "to take an account of the number of fanning-mills sold by the said defendants or under their direction since the 8th day of January, A. D. 1881, on which were the words 'Grain Grader & Seed Separator, Lawton, Michigan,' and to take an account of the profits thereon, and for the better taking of such account to examine the evidence taken herein as to the number of such fanning-mills so sold with such words thereon and to call any witnesses necessary therefor and to report the number so sold with the full amount of profits thereon to this court without delay for the further action of this court, until which time all further order and direction is reserved." This decree is a final decree within our former, decisions. *Lewis v. Campau* 14 Mich. 458 ; *Kingsbury v. Kingsbury* 20 Mich. 214 ; *Barry v. Briggs* 22 Mich. 201 ; *Damouth v. Klock* 28 Mich. 163 ; *Shepherd v. Rice* 38 Mich. 556 ; *McCombs v. Merryhew* 40 Mich. 721 ; *Taylor v. Sweet* id. 736 ; *Arnold v. Bright* 41 Mich. 207 ; *Tawas &c. R. Co. v. Iosco Circuit Judge* 44 Mich. 479 ; *Simon v. Schloss* 48 Mich. 233 ; *Morey v. Grant* 48 Mich. 326 ; *Witbeck v. Chittenden* 50 Mich. 426. The decree grants to the complainant the principal relief prayed for in his bill, and gives him the immediate benefit of the judicial action by an injunction that in effect puts an end to defendants' business. The only ground suggested for a contrary view is, that hereafter when the accounting is complete there must be a further decree. But it is not unprecedented that there should be two decrees in the same case which are final in the sense of finally determining rights ; and when the effect is such that the party obtaining the decree is immediately put in possession of the right adjudged to him, the right to appeal ought not to be questionable. Any other view would some-

times, in a case like the present, inflict irreparable injury with no means in the law for redress. No method is provided by statute or by the practice of the courts in this state whereby such mischief could be prevented otherwise than by appeal.

This is very different from a case where an accounting necessarily precedes the main redress. *Enos v. Sutherland* 9 Mich. 148. The accounting in this case is not even necessarily incidental to the main relief which was prayed; it is in the nature of a separate suit, and might well have been left to a suit at law.

The motion to dismiss is denied.

---

Appeal from Van Buren. (Mills, J.) April 9–10.— September 29.

INJUNCTION bill. Defendants appeal. Reversed.

*Lester A. Tabor* and *Henry F. Severens* for complainant. For definition of good will, see *Morgan v. Schuyler* 79 N. Y. 490; *Crutwell v. Lye* 17 Ves. 335; *Boon v. Moss* 70 N. Y. 473; *Sander v. Hoffman* 64 N. Y. 248; *Glen & Hall Mfg Co. v. Hall* 61 N. Y. 226: it follows the ownership of the business: Pars. Part. 262; and see 3 Kent's Com. 64; *Hammond v. Douglas* 5 Ves. 539; *Crawshay v. Collins* 15 Ves. 224; *Featherstonhaugh v. Fenwick* 17 Ves. 312; *Lewis v. Langdon* 7 Sim. 421; *Stuats v. Howlett* 4 Den. 559; 2 Lindl. Part. 855; *Kellogg v. Totten* 16 Abb. Pr. 35; *Mitchell v. Read* 19 Hun 418; *Cassidy v. Metcalf* 1 Mo. App. 593; *Davies v. Hadgsan* 25 Beav. 177; *Chittenden v. Witbeck* 50 Mich. 401; a partner cannot, on retiring from a firm which he went into for a limited time, claim an interest on the good will of the business: *Van Dyke v. Jackson* 1 E. D. Sm. 419; *Austin v. Bays*, cited in Lindl. Part. § 864; *Dimon v. Hazard* 32 N. Y. 65; *Howe v. Laurence* 9 Cush. 556; *Bullitt v. Chartered Fund* 26 Penn. St. 108; *Quinlivan v. English* 42 Mo. 362; the full abandonment of a trade-mark requires the intent to abandon it: *Lemoine v. Ganton* 2 E. D. Sm. 343: American Trade-mark Cases 142 *Sohl v. Geisendorf* Cox's Manual &c. 367; an acquiescence by

the owner of the trade-mark in its use by another, is in the nature of a revocable license, and confers no rights after the license is withdrawn: *Amoskeag Manf. Co. v. Spear* 2 Sand. 599; an acquiescence in the use of a trade-mark for twenty years by others does not preclude the owner from enforcing his sole right: *Gillott v. Esterbrook* 47 Barb. 455 : 48 N. Y. 374; see also, *Taylor v. Carpenter*, cited in American Trade-Mark Cas. 32; *Filley v. Fassett* 44 Mo. 173; *Comstock v. White* Am. Trade-Mark Cas. 232; *Kidd v. Mills* Cox's Manual 437; *Austen v. Boys* 24 Beav. 503, 2 Lindl. Part. 863; if a name indicating the nature of a machine also defines ownership or possession it may be registered as a trade-mark and cannot thereafter be used by any other person to describe articles of the same kind: *Messerole v. Tynberg*, Am. Trade-Mark Cas. 479; *Burnett v. Phalon* id. 376; *Newman v. Alvord* id. 404: 51 N. Y. 189; *McLean v. Fleming* Cox's Manual 326: 96 U. S. 245; *Caswell v. Davis* Am. Trade-Mark Cas. 429; see also *Wolfe v. Goulard* id. 226; *Merch. Banking Co. v. Merch. Joint Stock Co.* 26 Eng. 346; *Hirst v. Denham* 3 Eng. 833; *Witherspoon v. Currie* id. 29; the following cases, among many others, fully sustain complainant in the use of his trade-mark: *Godillot v. Harris* 81 N. Y. 263; *Coats v. Holbrook* Am. Trade-Mark Cas. 20; *Barrows v. Knight* id. 238; *Binninger v. Wattles* id. 318; *Dixon v. Guggenheim* id. 559; *Morrison v. Salmon* id. 643; *Halloway v. Halloway* id. 662; *Davis v. Kendall* id. 112; *Knott v. Morgan* id. 637; *Perry v. Truefitt* id. 644; *Hier v. Abrahams* 82 N. Y. 520; *Congress Spring Co. v. High Rock Spring Co.* 45 N. Y. 291; *Colman v. Crump* 70 N. Y. 573; *Holmes v. Holmes* 37 Conn. 278; *Croft v. Day* 7 Beav. 84: Am. Trade-Mark Cas. 649; *Sykes v. Sykes* 3 B. & C. 541; *Burgess v. Burgess* 17 E. L. & Eq. 257: Am. Trade-Mark Cas. 664; *Clark v. Clark* 25 Barb. 76; *Bradley v. Norton* 33 Conn. 157; *Gillott v. Kettle* 3 Duer 626; *Walton v. Crowley* 3 Blatch. 440; *Selchow v. Baker* 93 N. Y. 60: *Canal Co. v. Clark* 13 Wal. 311; *Mfg. Co. v. Trainer* 101 U. S. 51; no one can sell his goods as those of another aside from any rights under a trade-mark: *Bloss v. Bloomer* Am. Trade-Mark Cas. 200; *Partridge v. Menck* id. 72; *Williams v. Johnson* id. 214; *Rodgers v. Nowill* id. 660; *Lee v. Haley* Cox's Manual, 184; *Williams v. Johnson* id. 85; *Shrimpton v. Laight* id. 69; *Taylor v. Taylor* id. 70; *Knatt v. Morgan* id. 26; *Glenny v. Smith* id. 140; *Coffeen v. Burton* id. 52; *Singer Mfg. Co. v. Beill* id. 409; *Morgan Saw Co. v. Troxell* id. 144; *Thorley's Cattle Food Co. v. Morram* id. 395; Cooley on Torts 361.

*George W. Lawton* and *Edward Bacon* for defendants appellant. A bill of complaint suppressing the real relations between the complainant and defendant should be dismissed: Story's Eq. Pl. §§ 241, 242, 249, 251; *Leather Cloth Co. v. Am. Leather Cloth Co.* 11 H. L. Cas. 523; *Booth v. Thompson* 49 Mich. 73; *Elliott v. Amazon Ins. Co.* 49 Mich. 579; Lawton, Mich. being a post town cannot be appropriated as a trade-mark: *Canal Co. v. Clark* 13 Wal. 311; *Candee v. Deere* 54 Ill. 439; *Glendon Iron Co. v. Uhler* 75 Penn. St. 467; *Weatherspoon v. Currie* 3 Moak (Eng.) 29; "Grain Grader and Seed Separator" being words descriptive of the quality of the machine cannot be appropriated as a trademark: *Caswell v. Davis* 58 N. Y. 223; *Taylor v. Gillies* 59 N. Y. 333; *Roget v. Findleter* 7 Eng. 653; Cooley on Torts 361; *Chavin v. Walker* 22 Eng. 524: 5 Ch. Div. 850; *Mfg. Co. v. Trainer* 101 U. S. 51, 54; *Royal Baking Powder Co. v. Sherrell* 93 N. Y. Rep. 334; *Enoch Morgan Sons & Co. v. Troxell* 89 N. Y. 298; *Cape v. Evans* 9 Eng. 687; *Chroninsky v. Cohn* 39 Cal. 501:   Am. Rep. 476; *Van Beil v. Prescott* 82 N. Y. 630; words have their ordinary meaning: *Leoni v. Taylor* 20 Mich. 154; *L. S. & M. S. R. Co. v. People* 46 Mich. 211: 1 Bl. Com. 59; dissolution of a partnership does not deprive a partner of his interest in the good-will of the business or in a trade-mark: *Huwer v. Dannenhoffer* 82 N. Y. 501; *Hazard v. Caswell* 93 N. Y. 263; *Hall v. Burrows* 4 De G. J. & S. 150; *Bury v. Bedford* id. 352; *Wilcoxen v. McCray* 38 N. H. Eq. 467; competition is favored by the courts: *Snowden v. Noah* Hopk. Ch. 347; *Candee v. Deere* 54 Ill. 439; *Tabouchere v. Dawson* 1 Moak 711; partner ssucceed to partnership rights; *Huzard v. Caswell* 93 N. Y. 262.

SHERWOOD, J.   The complainant is a resident of Lawton, a village on the Michigan Central Railroad, and has been for the last thirty years.   The defendant Walker resides at the same place, and has since 1870.   The other defendant, Imus, resides at Galesburg, about twenty-seven miles distant, and has since childhood.   Besides the complainant, previous to 1870, W. B. Ledyard & Co, Jesse Smith, Ledyard & Aldrich, E. B. Aldrich, Potts & Aldrich, N. B. McKiney and W. H. Potts & Co. were all more or less engaged in the manufacturing of fanning-mills at Lawton, and some of them quite extensively.   These parties appear to have all made about

the same style and pattern of mill; the complainant making the least number of any of them. Until 1861 he was more or less in the employ of some of these parties, and at that date he commenced the manufacture of mills as his principal business, and had a shop at Lawton for that purpose. During this period, and until 1870, he did all his own work without the aid of machinery, making from ten to one hundred and twenty-five per year. During this latter period, and in the year 1870, defendant Walker worked for complainant. The mill was called by various names up to this time, and the entire enterprise seems, so far as complainant's pecuniary interests were concerned, to have been attended with precarious forebodings and very indifferent success, until he engaged in business with the defendant Walker, with whom he continued in business until January 18, 1881, when the copartnership was dissolved by mutual agreement.

The following is the agreement under which they commenced business in 1870 :

"This agreement made the twelfth day of February, A. D. 1870, by and between Myron H. Smith, of Lawton, Van Buren county, State of Michigan, of the first part, and Peter Walker, of the same place, of the second part, witnesseth, that the said Smith, in consideration of the covenants on the part of the party of the second part hereinafter contained, doth covenant and agree to and with the said Peter Walker that he will furnish shops, tools, team and wagon for the purpose of building fanning-mills and selling the same ; and the said Peter Walker, for and in consideration of the covenants on the part of the party of the first part, doth covenant and agree to and with the said Smith to pay for the use of the one-half of the above-mentioned articles the sum of ninety dollars on or before the first day of November, A. D. 1870. And it is hereby mutually covenanted and agreed by and between the said parties hereto that they each shall share equal in all expenses, losses, and gains, and at the expiration of the year's business the notes that have been taken for the mills sold shall be equally divided between the parties above mentioned. In witness whereof, we have hereunto interchangeably set our hands and seals the day and year first above written."

After making this contract, and on the 29th of March,

complainant obtained a patent for an "improvement in grain separators," which he and Walker used in the construction of the mill they made, and several other changes and improvements were subsequently made by them, which they used to advantage in the sale of their mills. It also appears that the name of the mill was changed, as the parties interested thought best for their interest. It clearly appears that after the formation of the copartnership between Smith and Walker the business was prosecuted with much greater vigor than before, and considerably extended, and the record shows that during the ten years the partnership lasted they manufactured and sold quite ten thousand mills, seven hundred of which were sold the last year. On the 4th day of January, 1871, the copartnership between Smith & Walker was continued under the following agreement:

" This agreement, made the fourth day of January, A. D. 1871, by and between Myron A. Smith, of the one part, and Peter Walker, of the other part, witnesseth as follows, to wit: The said Smith and Walker do hereby agree each with the other to form a copartnership for the purpose of manufacturing fanning-mills or other implements or articles to sell, each to be to one-half the expense for stock, manufacturing and selling the mills or other articles or implements. Each to individually furnish for the use of the company one pair of horses, harness and wagon, complete. If either should lose a horse he is to buy one and pay for it out of company money, and the loser shall refund the money so advanced on or before the first day of November, 1871, without interest. Smith is to furnish shop, tools, and barn, for the rent of one-half of which Walker is to pay Smith the sum of forty dollars on or before the first day of November, A. D. 1871. They are equally to share all losses (excepting the loss of a horse or horses) and expenses, and are to share equally in all gains, and the tokens for the sale of mills or other manufactures are to be equally divided at the option of either party. Smith and Walker own jointly one two-horse lumber wagon, with red box, whiffletrees, and neck-yoke belonging thereto; also one set of new bob-sleds. In witness whereof, the parties hereto have interchangeably set their hands and seals the day and year above written."

The partnership continued under this agreement until the

14th day of December, 1874, when the following agreement was entered into:

" This agreement, made the fourteenth day of December, A. D. 1874, by and between Myron H. Smith, of one part, and Peter Walker, of the other part, witnesseth as follows, to wit: The said Smith & Walker do hereby agree, each with the other, to form a copartnership for the purpose of manufacturing fanning-mills, or other implements or articles to sell; each to be to one-half the expense for stock, manufacturing and selling the mills or articles or implements; each to individually furnish for the use of the company one pair of horses, harness, and wagon, complete; each to run all risk on his own horses. All other horses, wagons, and harness to be owned and paid for (as they are now) by the said Smith & Walker equally. Myron H. Smith is to furnish the shop and barn on the premises owned by him, also three-fourths ($\frac{3}{4}$) of the lot east of said shop (rented by him of Mrs. Kennedy), for the rent of one-half of which Peter Walker is to pay Myron H. Smith one hundred and five dollars annually. Myron H. Smith to run all risks on said buildings. They are equally to share all loses (except on horses and buildings, as stated before) and expenses, and are to share equally in all gains; and the notes or other tokens for the sale of mills or other manufactures are to be equally divided at the option of either party. Myron H. Smith sells to Peter Walker a one-half interest in the following machinery, at the following prices, viz.:

One large cut-off saw table, with arbor and boxes and saw belonging thereto, and double pulley tighteners, price - - - - - - - $73 00
One turned shaft, 4 feet 8 inches long, 1 11-16 inches diameter, with boxes for same, and one wood driving pulley 23 inches in diameter, two wood driving pulleys 48 inches in diameter, and one single pulley tightener, price - - - - 17 00
Twelve feet 1 11-16 turned shaft, - - - 8 52
Two oil fountain hangers, 1 11-16x13, - - - 13 84
One iron pulley, 15x6½x1 11-16, - - 5 50
"   "   "   24x4½x1 11-16, - - - - 6 45
"   "   "   30x4½x1 11-16, - - - - 8 50
Two " slip collars, - - - - - - 2 40
Thirty and 3-12 feet 6-inch leather belt, thirty-nine feet 5-inch leather belt, and thirty-one and one-half feet 4½-inch leather belt, - - - 41 84

Eleven and 3½-12 feet leather belt, on jack,  -  -   $3 08
One large movable saw table, with 1⅛-inch arbor for
   sticker head (and bit-hole for boring machine).
   With said saw table and arbor are the following
   attachments : One dado head, with three sets of
   bits belonging thereto ; one matcher head (3-inch
   slot for bits) ; one pair 3-inch jointer irons ; four
   each ¼, ½, and ¼-inch matcher irons ; one long and
   two short turned collars ; one 12-inch coarse rip-
   saw and three .cast wrenches,     -     -     -      75 00
One movable saw table, next in size to the above,
   with 1⅛-inch arbor for sticker head, and one 10-
   inch fine cross-cut saw,    -     -     -     -     -   45 00
One 10-inch circular saw, 6 gauge, extra thickness, for
   mortising sieve-frames,     -     -     -·-     -      4 00
One 12-inch fine rip circular saw,     -     -     -     -    2 90
One 8-inch fine cross-cut circular saw,  -     -     -     1 25
One 10-inch fine rip circular saw,    -     -     -     -    1 25
One cast circular head, with saw for cutting wind-
   holes in side-boards and ear-pieces,     -     -      7 00
One boring attachment to large movable saw table,  15 00
One foot mortising machine, with all chisels, gouges,
   and punches belonging thereto,     -     -     -    20 00

" For a one-half interest in the aforementioned machinery
Peter Walker has paid Myron H. Smith one hundred and
seventy-five and 77-100ths dollars ; payment in full for the
same is hereby acknowledged by said Myron H. Smith.   The
following articles of machinery are owned equally by the
parties hereto (having been purchased equally by them pre-
vious to this date), viz.: One cast-iron bed for jointing and
matching, with four springs and rollers belonging thereto ;
one frame, arbor, and saw for mortising safes ; one black-
smith's iron vise ; one concave circular saw ; all 2½ inch leather
belting.

" It is further agreed that all machinery bought in future
shall be paid for and owned equally by the said Smith and
Walker, and that a list of all such machinery shall be kept
by each of the parties hereto.

" It is further proposed by the said Smith and Walker to
erect a building 19x20 feet on the east side of the shop owned
by Myron H. Smith ; said building to be paid for and owned
equally by the parties hereto.

" It is further agreed that all taxes on the property belong-
ing to the company shall be paid equally by the parties
hereto.

" It is further agreed that all damage done to the property of the company by fire or otherwise shall be equally borne by the parties hereto.

" At the dissolution of the company Myron H. Smith reserves the right to take back the boring attachment to large movable saw table at fifteen dollars ($15), and the foot mortising machine, with all chisels, gouges and punches belonging thereto, at twenty dollars ($20).

· " This copartnership may be dissolved by either of the parties hereto at the close of any year's business, and the property sold or divided as may be agreed upon between them.                                    MYRON H. SMITH,
                                                PETER WALKER.

Witness:   F. B. ADAMS."

This was the last written agreement of copartnership between Smith and Walker, which continued until January 18 1881.

The following property was taken by Walker on the division of the partnership property of Smith & Walker at that date : One horse, 1 peddling wagon, with rack, 2 sulkies, 2 light cable chains, 10 or 11 fanning-mills, 3 to 5 fanning-mill woods, complete ; a quantity of parts of mill-woods, 2 or 3 sets of castings and wrought-irons ; parts of 8 or 10 sets of irons, suspenders, and braces ; 703 feet of wire cloth, 500 1¼x1¼-inch carriage bolts, 150 other bolts, a quantity of small staples, 3000 or more ; 2½ gross screws, 2 one-pound papers clout-nails, one dozen papers 4-ounce tacks, 3 lbs. lamp-black, 100 lbs. nails, 100 lbs. vermilion primer, 200 or more shipping-tags, 20 gals. varnish ; 10 cans of different sizes.

The following bill of sale was made and executed by defendant Walker, and thereupon the following dissolution notice was signed by both Smith and Walker.

" This is to certify that I have sold to Myron H. Smith, of Lawton, my undivided one-half interest in boiler, engine, and all pipes, etc., belonging thereto, and all other machinery, wrenches and fixtures belonging thereto, in his shop · on lot 9, block 9, D. O. Dodge's addition to the village of Lawton ; also the buildings and steam-box on lot eight (8), block nine (9), D. O. Dodge's addition to the village of Lawton ; also

3883 feet bass-wood lumber at S. H. Jones' mill; also all lumber in and around the above shops, excepting my one-half interest in a quantity of ash-shafts $2\frac{1}{2}$ x $2\frac{1}{2}$-inch square, in the shed on lot eight (8), block nine (9), as above described.

I hereby acknowledge having received six hundred and sixty-nine 55-100 dollars ($669 55-100), payment in full for my undivided one-half interest in the above-described property.

PETER WALKER.

*Lawton, Mich., January* 18, 1881."

" DISSOLUTION OF COPARTNERSHIP. Notice is hereby given that the copartnership heretofore existing under the firm name of Smith & Walker is this day dissolved by mutual consent. All accounts due said firm, and all claims against them, will be settted by Myron H. Smith, who will continue the business at his factory formerly occupied by the old firm.

*Lawton, January* 18, 1881."

The defendant Walker, during the continuance of the co-partnership, did the most of the selling and looked after the business generally, and the complainant attended mainly to the manufacture of the mills and making them ready for sale.

In 1878 complainant and defendant Walker took into their service the defendant Imus, and gave him as compensation a portion of the proceeds of the business. He continued in business for Smith & Walker, if not in partnership with them, until the firm of Smith & Walker was dissolved, as above mentioned. He had also sold mills for Smith & Walker during the seasons of 1872, 1873, 1876, and 1877; and on the dissolution of that firm he and Mr. Walker formed a copartnership, and under the name of Walker & Imus have continued the business of making and selling fanning-mills, making Lawton their headquarters and place of business up to the present time. The complainant also continued in the same kind of business at his shop in Lawton until the time of filing his bill of complaint in this cause.

The mill made and sold by the complainant was the same as formerly sold by Smith & Walker, and contained, besides the improvement patented, some other changes made by Smith & Walker, and had, most of the time they were in

business together, painted thereon the words, " Smith's Grain Grader & Seed Separator : Smith & Walker, Lawton, Michigan ; Warranted." Omitting the words "Smith & Walker," the complainant continued to use the same words upon his mills after his dissolution with Walker. The defendants also used the same mill Smith & Walker had been using when they commenced business, and had painted thereon : "Improved Grain Grader & Seed Separator ; Walker & Imus, Lawton, Michigan ; Warranted."

Both complainant and defendants continued to make and vend in this State the articles severally made by them ; the complainant selling and frequently offering to sell to the defendants mills of his manufacture, knowing the use to be made of them, and that they would be sold by them with the inscription of the words they used thereon, until the 28th day of July, 1882, when complainant filed his bill of complaint alleging that he originally started the fanning-mill business in which he and Walker were subsequently engaged, and prosecuted it alone until 1870, during which time the mill was known as "Smith's Lawton Mill," and under that designation had acquired a good reputation, his mills being sold principally in this State, and he had from small beginnings gradually secured a good business in the fanning-mill trade ; that in 1870, after securing a patent for a certain improvement, he gave to his mill the name, "Grain Grader & Seed Separator, Lawton, Michigan," and had these words painted on each mill thereafter manufactured and sold by him ; that said mills are distinguished from all other mills in that manner ; that such name and words originated with him, and that his mill with such name or designation, and the place of manufacture stenciled thereon, through his labor and capital, and industry and perseverance, has acquired a valuable reputation throughout the State, and he is enabled thereby to make large and profitable sales thereof, and that said name and place of manufacture stamped on said mills constituted his trade-mark in said business; that about 1870 he made arrangements with defendant Walker to assist him in carrying on the business,

and that he and Walker continued to manufacture and sell said mills, Walker receiving a share of the profits for his services, and for machinery purchased by complainant and Walker of Walker, until the close of the year 1880, when he complainant) purchased from said Walker all his interest in the machinery and business, and that since that time complainant has conducted the business alone, and has been the sole owner thereof; that said Walker never had any interest in the mill except to share in the proceeds of the manufacture and sale thereof from year to year, to pay for his services; that immediately after he purchased the said Walker's interest as aforesaid, Walker & Imus went to Otsego, in same State, and engaged in the manufacture and sale of mills, using thereon the following words in painted letters, "Grain Grader & Separator, Improved, Lawton, Michigan; Warranted," and that they continue so to do; that, as a matter of fact, said firm of Walker & Imus do not, and have not, manufactured any mills at Lawton; that the name used on complainant's mill was first brought into use and adopted by him to designate his mill, and is and was his "trade-mark," and that defendants have no right to use the same upon their mills, neither have they any right to use wagons in the sale of their mills lettered with the words "Lawton, Mich.;" that the use of said trade-mark upon their mills, and said words upon their wagons, is an infringement upon the rights of the complainant, and a deception upon the public, seriously injurious to complainant; that the sale to him by Walker vested in him the good-will of the business, and that the manufacturing and sale of the mill vended by Walker & Imus is a fraud upon the complainant and an infringement upon his right to the good-will of his mill and the business carried on by him and Walker, and upon his trade-mark, as claimed above; that the complainant has suffered great injury by the sale of defendants' mill, under representations by them that theirs was the mill made and sold by complainant, and by other fraudulent devices, calculated to falsely represent their mill to be the same mill as complainant's. The bill prays for an injunction restraining defendants from mak-

ing or vending the claimed assimilated mill of defendants, and preventing them from using the pretended trade-mark, and for an accounting to complainant for his alleged injury in the premises.

The defendants, in their answer to the bill of complaint, say that Ledyard & Aldrich, Bonsteel & Co., and William H. Potts & Co. were all manufacturers of fanning-mills at Lawton many years before 1870, and that the complainant acquired what knowledge he had of the business by working as a hand in the shops of some of these parties, and some time previous to 1870 set up business for himself in a very small way, and so continued until 1870, not making in any one year more than one hundred and twenty-three mills ; that the mill he made was modeled after those that had been made in Lawton for many years before, by those in whose employ he had served ; that there was no originality in the mill made by complainant, except such as he secured letters patent for, by way of an improvement hereinbefore referred to. They deny that such improvement was patented under the name and designation of "Grain Separator," but aver that the patent was obtained for an improvement in a class of machines designated at the patent-office and elsewhere as "Grain Separators & Graders ;" they deny that the complainant, on obtaining his letters patent, adopted and applied to his mill the name "Grain Grader & Seed Separator, Lawton, Michigan," or that these words were afterwards stamped upon each mill sold by him, or that complainant, after or during 1870, manufactured any mills by himself or others, but aver that he entered into a partnership with defendant Walker to manufacture such mills, and that such partnership and business continued uninterruptedly until it was dissolved in 1880, and that during said partnership the defendant Walker, with the complainant, designed names and marks to put upon their mills, and that while their mill was known by the name of the class of machines to which it belonged, and generally but not always had painted thereon with them the words "Grain Grader & Seed Separator," to show that it was adapted to and could do other

work than merely separating the chaff and dirt from the grain, yet at no time were these words adopted by the said Smith & Walker as their trade-mark nor as the trade-mark of the complainant, but, on the contrary thereof, at different times they adopted different names for their mill, at one time calling it the "Queen of the West," and at others such other name as they thought might be most useful in the business, but without any intention or understanding that it should be their trade-mark. They further aver that said Smith & Walker never had any trade-mark. They further aver that said words "Grain Grader & Seed Separator," the same being merely descriptive of the work done by said mills, and being also in use by other manufacturers of machines to designate and make known the kind of work done by it, could not be legally appropriated by said Smith or said defendants as a trade-mark.

The defendants admit that Walker sold his interest in the machinery to complainant, but deny that Walker sold to said Smith his interest in the business of making fanning-mills at Lawton or elsewhere, or that there was ever any understanding between Smith and Walker to that effect, or that the defendants have injured the business of complainant, or that he has suffered any damage at their hands. Defendants further say that the direction of the business is from Lawton, and always has been, where Mr. Walker resides, and that about the same method pursued by Smith & Walker in making and getting their mills upon the market has been adopted by Walker & Imus. They further say, in competing for the sale of their mill, they have never allowed their agents to take any unfair advantage of the complainant. Notwith-standing complainant's competition has been strong, they have always treated him and his business with courtesy.

A very large amount of testimony was taken upon both sides, much of which might have been very properly omitted, and thereby a large expenditure of money would have been saved to the parties, and the courts relieved from a great deal of unnecessary labor.

The cause was heard on the pleadings and proofs taken at

the Van Buren circuit, and the injunction prayed for was granted, and an accounting ordered taken before a circuit court commissioner of the number of mills sold by defendants, and the number thereof containing the words painted thereon, "Grain Grader & Seed Separator; Lawton, Michigan," and to take an account of the profits thereon. The following is the decree to make the injunction perpetual, and the terms thereof:

"This cause coming on to be heard upon the pleadings filed and the proofs taken therein, and the pleadings and proofs having been read and the counsel for the respective parties having been heard, and the court being fully advised in the premises, on consideration thereof doth adjudge and decree that the said defendants, Peter Walker and James H. Imus, and their agents, employes, and servants, be perpetually restrained (1) from making, painting, or stenciling, for sale, and from selling fanning-mills marked, painted, or stenciled in imitation of the complainant's fanning-mills; (2) and from using upon fanning-mills manufactured or sold by them, or either of them, the words 'Grain Grader & Seed Separator, Lawton, Michigan,' in imitation of complainant's fanning-mills; (3) and from selling or offering for sale fanning-mills not manufactured at Lawton, Michigan, in whole or in part as and for the Lawton fanning-mill; (4) and from and in every manner representing the complainant to be dead or out of business, or that they have succeeded him in business."

The defendants both appeal to this Court.

The complainant does not claim or charge expressly that defendants are or have been using his patent in their mills, or have infringed upon it; but his claim is that he is the owner of what he calls his trade-mark, consisting of the words hereinbefore given, and the good-will of the business, which had been brought into existence by the energy and skill used by himself and the defendant Walker; and that he has been deprived of the same largely since he dissolved his partnership with Walker by the defendants, who have pirated both, by assimilation, misrepresentation, and fraud in making and selling their mills. And counsel for complainant further insist that the facts established by the evidence clearly show that Smith was the original owner of the enter-

prise of manufacturing and selling fanning-mills at Lawton, and that Walker, while he was in business with complainant, was merely the tenant of what Smith put in, including the good-will and trade-marks of the business ; or, if this be not so, if Walker is to be regarded as the owner of any interest in the foundation of the business, then he transferred it to Smith at the 'time of their dissolution ; and that this latter position is strengthened by the application of the doctrine that when one partner sells out his interest in the corporeal effects of a going trade, he, by implication, sells his interest in the good-will of the business.

Lawton at an early day, it appears from the record, became noted, if not famous, for its manufacture of fanning-mills, and the "Lawton Mill" seems to have been, to a greater or less extent, a term applied indiscriminately to all of them by the manufacturers, among whom the plaintiff seems for many years to have ranked least ; and so far as the term "Grain Grader & Seed Separator" is concerned, the complainant seems never to have applied it to the mill he made, except on an occasion of a fair held at Paw Paw, where he was exhibiting his mill for inspection and premium, until after he entered into partnership with Walker for the purpose of making and selling fanning-mills ; that previous to that time the testimony tends very strongly to show that neither the plaintiff's mill, nor the amount of business he had done in making and vending the same, had been sufficient to give it any peculiar characteristics, reputation or advantage over any other mill made at Lawton, by reason of any particular name or mark used thereon, or for any other reason.

The trade-mark claimed by the complainant as his exclusive property seems never to have received a registration at the patent-office; neither does the record show that complainant ever made any application therefor. Such being the fact, so far as the relief complainant asks for relating to the alleged infringement of his claimed trade-mark is concerned it depends entirely upon his common-law rights. By the common law, "every manu_facturer, and every merchant for whom goods are manufac-

tured, has an unquestionable right to distinguish the goods that he manufactures or sells by a peculiar mark or device, in order that they may be known as his in the markets for which he intends them, that he may thus secure the profits that their superior repute, as his, may be the means of gaining." And it is well settled that a manufacturer or vendor may, by a priority of appropriation and adoption of names, marks, letters or other proper and appropriate symbols, so distinguish his manufactures from others as to acquire a property therein as a trade-mark; but not, however, until he has given it out and published it to the community as his, and that he has adopted it as an original thing, or has in some way become the lawful owner thereof. *Stokes v. Landgraff* 17 Barb. 608; *Williams v. Johnson* 2 Bosw. 6; *Amoskeag Manuf'g. Co. v. Spear* 2 Sandf. 599.

Chief Justice Cooley, in his work on Torts, says: "In general, a man may adopt for a trade-mark whatever he chooses; but when he asserts and seeks to enforce exclusive right therein, it becomes necessary to ascertain whether it is just to others that this be permitted. If the name, device, or designation is purely arbitrary or fanciful, and has been first brought into use by him, his right to the exclusive use of it is unquestionable." Cooley on Torts, 361, and see cases cited. "But the mere designation of a quality cannot be appropriated as a trade-mark." *Caswell v. Davis* 58 N. Y. 223; s. c. 17 Am. Rep. 233; *Candee v. Deere* 54 Ill. 439; *Burke v. Cassin* 45 Cal. 467; *Taylor v. Gillies* 59 N. Y. 331. " Neither can any general description by words in common use, of a kind of article, or of its nature or qualities, * * * nor can the name of a place be appropriated as a trade-mark as against others who may see fit to engage in the same business at the same place." A trademark, when adopted, may be lost by being suffered without objection to come into common use in the trade, and rights under it may be waived as against those using it with the knowledge of the owners, and without objection, though such use has not become general, and it can only be sold with the business to which it was intended to apply. Cooley on

Torts, 363, 364, and cases cited; *Van Beil v. Prescott* 82 N. Y. 630.

Complainant does not claim to have used on any mill he sold previous to obtaining his patent the words he claims as his trade-mark. He says that the words he used before that were "The Lawton Mill." I do not think the record furnishes any showing that complainant ever adopted these words as a trade-mark for his mill business. It does not show any difference in the construction of mills made at Lawton by plaintiff and those made by other parties prior to 1870; neither do I discover any intention on the part of complainant to make the words "The Lawton Mill," his trade-mark, and therefore dismiss the consideration of any such claim made previous to complainant's obtaining his patent in 1870.

Previous to that time, and on the 29th of March, 1870, complainant formed his copartnership with defendant Walker for the purpose of manufacturing fanning-mills at Lawton, and his partnership with this man in this business and at this place continued uninterruptedly until the 18th of January, 1881. Previous to the commencement of this partnership, and in September, 1869, it appears that Smith, after he applied for a patent on an improvement he had been making, painted upon the mill he manufactured, and which contained the improvement, the words "Smith's Grain Grader & Seed Separator, Lawton, Michigan;" and that said mill containing said improvement, and such other improvements as Smith & Walker made, and of which there were several, was the kind that they made and sold during the existence of their copartnership, using the same words stenciled upon the mill.

It is claimed by the counsel for complainant that the words above quoted were his trade-mark; that he had appropriated and adopted them as such; that he had the legal right so to do, and they were his property, and he had the exclusive right to use them upon fanning-mills; that Walker, by his joint use thereof as complainant's partner in the business to which they had been applied, acquired no interest

in them, although by the efforts of the firm, and principally through his management, the business during the ten years of its existence increased seven-fold, and the profits in the same ratio ; that Walker never acquired any interest in such trade-mark, nor in the good-will of the business thus built up ; that if he ever had any such interest he transferred it to complainant when the firm of Smith & Walker was dissolved, and Walker gave his bill of sale of property to Smith ; and that these conclusions necessarily follow from the several agreements made between the parties, hereinbefore stated, and the other facts appearing in the case.

The testimony of complainant as to the terms of the contract of copartnership between complainant and defendant Walker, not contained in the written agreements, does not appear to be very much relied upon by complainant's counsel. That testimony was not admissible under the pleadings in the case. The written contracts contain the agreements of the parties upon that subject, and their rights thereunder must be determined thereby.

In the view we have taken of the case thus far, it will readily be seen that the exact relations between complainant and defendant Walker, and the rights acquired thereunder, have very much to do with the equitable rights of these parties. The idea that Walker, under the agreement between him and complainant, was a mere "tenant of what Smith put in, including the trade-marks and good-will of the business," or that either of the parties had any such understanding, cannot be entertained. It would be doing violence to the simplest construction that can be given to the language used in either of the agreements made by the parties. The relation created by either of the written agreements between the parties was that of copartners, and the business included in the enterprise was that of making fanning-mills. The terms were briefly but clearly stated, and the rights of the parties thereunder must be determined by the law governing that relation. The copartners had agreed to make fanning-mills. No particular mill or kind was named, but the expense thereof for stock, manufacturing, and selling the mills

was to be shared equally. Smith was to furnish shop, tools and barn, and Walker was to pay one-half of the rent of the same. In the first and second agreements no particular place was specified, but in the third, the shop and barn were to be those owned by complainant in Lawton, and the partners were to share equally all gains, profits and tokens, and all losses arising in the business. The mill which it was decided they should make was that which the complainant was then manufacturing, and for which he had secured, or was about obtaining, letters patent for an improvement. It was to this mill, with this new improvement made thereto, the complainant says he applied to and adopted for the words which he calls his trade-mark, viz., " Grain Grader & Seed Separator."

The complainant, in describing this improved mill which the copartners were to make, says in his bill of complaint: " The mill so known and designated is constructed different from any other mill manufactured, and in its operation works differently, and cleans grain in a much better manner than any mill manufactured within the knowledge " of the complainant, "and has advantages for cleaning grain not used or adopted by any other mill or manufacturer ; * * * that after he applied for his patent, and soon after or about the time he procured the same, he made arrangements with Peter Walker to assist him in the manufacture and sale of his said mills at Lawton, Michigan, so known as the ' Grain Grader & Seed Separator,' and by such arrangements gave to the said Walker a share of the profits in the manufacture and sale of such mills, and he and said Walker, under such arrangements duly made from year to year, duly manufactured and sold such mills during each year thereafter until sometime about the year 1874, when he sold to said Walker a portion of the machinery in his said shops, and afterwards he and the said Walker purchased other machinery and put in such shops, and under such arrangements, made from year to year, he and the said Walker continued to manufacture and sell such mills until about the close of the year

1880, when he purchased from said Walker all his interest in such machinery and business."

From this statement of complainant it clearly appears that the new or improved mill was the' one complainant formed the copartnership to manufacture and sell, and not the old one before then made by the complainant. It was this improved mill that was to be made and introduced to the public by the firm, and for which its favor and good-will was yet to be sought and secured.

The complainant, it will be noticed, does not speak of Walker's business relations with him through these ten or eleven years of toil and anxiety as those of partners, nor intimate that he had acquired at any time any interest in the mill or even in the business, save as a mode of payment for Walker's services, which he claims were rendered only as an assistant to complainant in the sale of mills, and in the conduct and management of the business. He does not even allude to the written agreements, from which alone the character of the business was to be determined and, as we have said, the rights of the parties were to be adjusted; but whatever the character of the business may be found to be, he does, however, admit its continuance until the dissolution of the copartnership in 1881.

I think it satisfactorily appears that it was in the conduct and management of the business of making and vending their new and improved mill by the firm of Smith & Walker, with such subsequent improvements made therein by them, and in which the defendant Walker so largely participated, that all of the good-will now claimed by complainant accrued, and all the gain and profits therefrom were derived, and that each of the copartners was entitled to an equal share therein, and that they became each entitled to share equally in the ownership in said mill, except as to the interest in the patented improvement. This, however, it would appear had been so much changed and improved in the modifications made by the firm during the period of its existence and business as to be almost entirely eliminated from the construction of the

mill finally made and sold by the firm. Such was the situation when the dissolution of the firm of Smith & Walker occurred. I find nothing in the written notice of dissolution signed by the parties to the firm evidencing any sale or transfer of the defendant Walker's interest in the business, or of his interest in any trade-marks used in the business or in the good-will thereof, to the complainant; neither do I find anything contained therein, or in the bill of sale made by Walker to complainant of property, on the dissolution, from which such transfer can reasonably be implied or fairly inferred. If, as counsel for complainant claims, Mr. Walker had transferred *all* his interest in the business of the firm, and reconveyed to complainant all the property he bought of him at the beginning and during the continuance of the copartnership, there would be more reason for the conclusion reached by counsel; but his premises not being supported by the proofs, his deductions therefrom could hardly fail to be erroneous. While the papers alluded to contain a notice that the complainant will continue the business at the place formerly occupied by the firm, it does not say when Mr. Walker will continue it. Nor is there any intimation that he will discontinue it, or cease to use the interest he retained, and had not transferred to complainant, or otherwise disposed of to any one.

The statement contained in the complainant's bill to the effect that the defendant Walker, on the dissolution of the copartnership, transferred all his interest in the business to the complainant, is not sustained by the proofs, but on the contrary thereof I think there is some testimony showing that such was not the fact; that the copartners themselves contemplated, at the time of the dissolution, each of the co-partners would thereafter carry on the business in which the company had been engaged. In the division of the property thus made between them each took a portion, which would have been useless except in the business for which it was made and intended. The firm had also quite a large number of mills then on hand and remaining unsold, which were equally divided between them. The engagement for a part-

nership by Walker with defendant Imus, for the purpose of subsequently conducting the same business, was made even before the firm was dissolved, and the testimony tends strongly to show this fact was known to complainant; and after such new firm had commenced doing the same kind of business as the old, the complainant proposed to manufacture for them a large number of the mills to be used in their trade, and actually did sell them some upon which defendants stenciled the same words claimed by complainant as his trade-mark, and used on the Smith & Walker mills; and it further appears, by the letters written by complainant to Walker, offered in evidence, that the complainant was very anxious to make such sales to the defendants of his mills for the defendants' trade. Among these letters appears the following written to Walker while he was engaged in the northern part of the State making sales of the Walker & Imus mills:

"TRAVERSE CITY, MICH., May 27, 1881.

*P. W.* You thought you would like to get about thirty of these mills. I would like to sell you the entire lot of mills, sales that have been made here, and you take charge of the peddlers. They are worth more to you than they are to me. Please state what you will give for them, and I will give you an answer; and if I sell to you, be ready to close contract within twenty-four hours after I receive your proposition. I think they can do good work if properly handled, but I am anxious to get out of it, as I am satisfied that everything I do this year will work against me. Please answer soon.                                        M. H. SMITH.

P. S. I think I will go home on Monday or Tuesday next. Try and make arrangements to take them, and we will make contract when I go home. Please consider this before you ship your next car-load.          M. H. S.

Please thoroughly consider this matter before you order your next car-load. I want to sell."

"TRAVERSE CITY, May 31, 1881.

*P. W.* Your card rec'd. I can but *still hope* that you will purchase my mills and material, as it is worth more to you than any one else, and if I do not sell it will be my ruin. Please make me the best offer you can, and I will come on first train and make the contract, but do let me get out of

this business.  I would rather lose part now than to lose all in the end, and you certainly can make well out of it.  I have mills enough finished here to relieve your hurry in shop there if you take them.  Please do not refuse, but make me an offer and I am sure we will come to a bargain.  If I could possibly carry it through I would not be so anxious to sell, but I cannot, as every move I make is a blunder.  I will not require but little down, and will store any stuff you may have left till next spring.  The way I will let you have it there can be but little risk on your part, as it cannot be replaced at the price; but let me hear from you that you will take it, and there will be no more delay on my part, but I will attend to it at once.  Yours,           M. H. SMITH.

P. S.  Do not get out of patience, but do try and think favorable of this matter.                         M. H. S."

Upon a careful reading of all the testimony upon this subject I cannot avoid the conclusion that it was in the contemplation of both Smith and Walker, at the time they dissolved partnership, that each would thereafter carry on the business of making and selling the said fanning-mill they had been vending, and the reputation of which had been built up by their joint efforts in the firm of Smith & Walker. · If the words " Grain Grader & Seed Separator " ever became a trade-mark in the business of manufacturing and selling fanning-mills, it was made so by the use that the firm of Smith & Walker made of it, and whatever of value there was in such trade-mark, if any, like that of the good-will claimed by the complainant to be exclusively his, belonged alike to each member of the firm on its dissolution.  And the law in such cases gives to each member of the firm, when it is dissolved, the right to carry on the old business in competition with the other, so long as neither can be made liable upon the contract of the other.  And such I understand to be the rule in the case of partnership trade-marks and good-will of a business, so long as the same remain undisposed of by the firm or its members.

This record does not present the rights of a retiring member of a firm which continues after his withdrawal, and we cannot consider the argument of counsel based upon that theory.  A partnership trade-mark may be and often is an

57 MICH.—31

important element in the good-will of the company business, and is an asset of the firm; and unless otherwise provided in the contract of copartnership, on its dissolution may be sold by the partners, or used by either of them thereafter until otherwise disposed of. The complainant exercised his right in this case to use it, but denies that right to the defendant Walker, and in this denial he is wrong.

This substantially disposes of this case. It is claimed, however, by counsel for complainant that, independently of the charges in the bill, of defendants' infringing the complainant's right to the exclusive use of the said trade-mark and good-will of the business of Smith & Walker, he may still maintain his case against the defendants for the fraud committed by them and their agents in falsely representing to his customers and the trade that defendants have purchased the complainant's business and interest in the mill business; that the complainant has retired from business; that the mill defendants sold was the same as the one manufactured by complainant; and sometimes by representing complainant to be dead, and in various ways assimilating the complainant's mill, or the mill made and sold by him; that by such fraudulent practices and misrepresentations the complainant has been greatly injured in the reputation of the mill he makes and sells, his sales greatly curtailed thereby, and very much to his damage.

If all these averments were true, and supported by the proofs, the complainant has his remedy at law, which would seem to be adequate.

But, aside from this, these averments are not the grievances of the complainant's bill; they are matters in aggravation of the main charge or substance of the . complaint, which is stated in the language of the brief of complainant's counsel, and I think correctly so, "pirating complainant's trade-mark and good-will" of his manufacturing business, and to prevent which he asks relief, and claims damages for the injury sustained thereby.

Of course, if the complainant has no exclusive right to what he claims as his "trade-mark," and the good-will he

seeks to defend and protect, there is no occasion for considering the other charges, which are only in aggravation of the alleged infringement of that right.

I think the doctrine applicable to the class of cases within which the complainant intended to bring his case is very well stated, under the authorities, by his counsel, wherein he says: " It is that one man shall not, in his own business, simulate the business of another by adopting the marks and tokens employed by that other to identify his productions, and so avail himself of the reputation and credit which the other has acquired to his own profit and advantage." But this doctrine is not applicable to the facts upon which the complainant's case rests. The want of exclusive ownership of what is claimed by the complainant in this case has rendered unnecessary the discussion of whether the words claimed as a trade-mark could legally be adopted and made such. They clearly expressed the uses and purposes of the class of machines to which the complainant's belonged, and were also indicative of what the mill could do; and it is difficult to see what other purposes could have been intended by their use in connection with the fanning-mill, or upon what principle their exclusive application could have been made by the complainant or Smith & Walker. Walker says they never were adopted or used as a trade-mark for the mill or business; and that they were so intended by either of the partners seems never to have been known or so understood by any person whose business it was to make or sell the mills while the firm was in existence, unless it was by Mr. Smith. He certainly appears to have been very reticent upon a subject the publication of which would, as he claims, have been of such great pecuniary advantage to both him and to the firm of Smith & Walker. It is very difficult to reconcile much of the testimony in this case with what are claimed to be the facts. Smith does not claim, however, that the words constituted a partnership trade-mark, and I very much doubt, under the authorities cited by counsel in this case in their briefs, if the words could be legally adopted and used to the exclusion of their use by others as a trade-mark for the complainant.

But in the view I have taken of the case, whether they could or not is of little consequence.

As the case comes before us upon this record the decree at the circuit, I think, should be reversed, the injunction dissolved, and complainant's bill dismissed, with costs of both courts to the defendants, and decree should be entered in this Court accordingly.

COOLEY, C. J. and CAMPBELL, J. concurred.

---

Afterwards at the following January term, a motion for a rehearing was denied in the following opinion:

SHERWOOD, J.  A motion for rehearing has been entered in this case by the learned counsel for complainant, and in the briefs they have furnished to the Court the points upon which they rely are presented by them with much earnestness and vigor.  Seven reasons are stated why the motion should be granted and the cause reheard for our consideration, each of which has received a patient and careful examination by the members of the Court who heard the cause at the April term, and in so doing we have not failed to keep in view the importance of our conclusions to the parties whose rights are to be affected thereby.  We have taken time to carefully review the entire record, which is large, and critically examined the able and exhaustive briefs of both the learned counsel for the complainant, whose alleged grievances are so forcibly presented, and we will now consider the points made in the order in which they are presented.

It is claimed that this Court has fallen into errors of both law and fact, from which a wrong result has heretofore been reached, and it is insisted (1) that a mistake was made in finding "that the plaintiff's place of business was at Lawton." The answer of the defendants and the testimony both show that Walker's residence has been at Lawton continuously since January, 1870 ; that he has been engaged all this time in making and vending fanning-mills, and that he has

had no other place of business during this period, and that it was the place of business of the firm of Smith & Walker as long as the firm existed, and that the defendants, during the existence of their firm, have never had any other place of business; that it has always been their headquarters,—the place where the notes they have taken in their business are made payable, and the place where they receive all their letters relating to their business when not engaged on the road; that the business office of the firm of Walker & Imus, the defendants, was at the residence of the defendant Walker, in Lawton. We shall not attempt to quote from the pleadings or proofs upon these several points, but will further call attention to the fact that upon this point the question as to the place of business of these defendants was fully discussed before us upon the hearing, and our attention was called to it in the briefs of counsel upon both sides, and we find nothing in the review to change the views upon this subject expressed in the opinion.

Complainant's second point is that this Court found that "the case does not present the rights of a retiring member of a firm, which continues after his withdrawal." This is claimed to be a serious error. We fail to see how any other view can be properly taken than the one we expressed upon this subject. The partnership between Smith & Walker is entirely ignored in the complainant's bill, and it consisted of no other persons than those two, and when the partnership was dissolved, the dissolution left no firm with which Smith was connected existing. This subject was also called to the attention of the Court in briefs of counsel, and fully argued upon the hearing.

The third point presented is to the effect that this Court should have found from the evidence that the defendants sold their mills, and represented them as the mill which Smith was manufacturing, and as the Lawton mill. The testimony upon this subject was all seen and carefully perused before the case was decided, and the point made thereon by counsel fully discussed before us at the hearing. A review of the record and a careful consideration of the views

expressed by counsel in their brief upon this motion, have failed to satisfy us that the grievances complained of under this head are not remediable at law.

After the review we have made we think the facts, as we find them upon the record, fully warrant us in saying that after the dissolution of the firm of Smith & Walker, Walker had the same right to make and vend the mill Smith & Walker sold as did Smith, unless Smith could claim some exclusive interest in the patented improvement, which was not urged upon the hearing, or at least was not seriously or especially relied upon to obtain the relief asked in the complainant's bill. Of course, if the defendants represented that the mills they sold were made by Smith, when they were not, and the latter suffered damages thereby, he has the proper action therefor; but so long as the defendants had the right to sell the mill they did, they were not liable to be proceeded against as has been done in this case. It is not for every injury arising from false representations made that equity will furnish the remedy, but only where a court of law fails to provide adequate relief. The authorities under this head, cited at the hearing, and those referred to upon this motion, have been examined. We find nothing in them to change the views formerly expressed. The present mode of the manufacture of mills is now so changed from what it once was that the places where the different parts are made and the places where they are ultimately put together and completed for the trade, have but little bearing upon the question as to where the defendants' business must be regarded as carried on.

It is claimed, under the fourth point, that under the circumstances of this case we adopted the doctrine as applicable thereto, that "the name of the place could not be adopted by one of the partners, to the exclusion of the other, after the dissolution, and that we failed to observe the distinction taken when the production is a natural one of the locality, and where it is a manufactured article, and especially when the name of the place has acquired a secondary signification." We have no desire to modify the opinion already

given upon that subject. The question suggested was fully argued upon the hearing, and fully considered and discussed by the Court before the case was decided. The plant, so called, and claimed to have been owned by the complainant, when the firm of Smith & Walker was formed became merged in the business of the firm, and the fact that the firm used some of the buildings belonging to Smith in which to carry on its business, and for which Walker paid half the rental value, did not change or modify the rights of the parties in the business. The "plant" became the property of the firm, and whatever there was of it, after carrying on the business ten years, belonged to the partners equally, without some agreement to the contrary ,and none such seems ever to have been made. If, therefore, there was anything of value in the name of the town, as applied to the business done by the firm, neither had the exclusive right to its appropriation after the dissolution of the firm; and we further think it is but a fair deduction from all the testimony that both Smith and Walker so understood it at the time the partnership was dissolved. We fully recognize the distinction alluded to in the briefs of complainant's counsel, but do not regard it as applicable to the case made in the record.

The complainant's fifth point is as to the correctness of the statement in the opinion filed, wherein it is said: "Complainant does not claim to have used on any mill he sold previous to his obtaining his letters patent the words he claims as his trade-mark," viz., "Smith's Grain Grader & Seed Separator, Lawton, Michigan." An inspection of the record shows this statement fully sustained by the testimony of Smith himself. No further notice need be taken upon this point.

The sixth point raises the question of the proper legal construction of the notice of dissolution of the firm of Smith & Walker. We see no occasion for departing from the construction we have already given to this instrument, and it is difficult to see how views so diverse can be entertained as to its legal effect, or as to what was the intention of the parties when it was made.

The seventh point relied upon has already been sufficient-

ly noticed in what has been said, and we have only to add, in conclusion, that this Court will always regard a motion for rehearing with favor, which will call our attention to something contained in the record or briefs of counsel that has been inadvertently or otherwise overlooked or omitted, which is material to be considered in making a proper disposition of the case, or which will challenge our attention to a misapplication of the law; but, unless this is done, a rehearing will not be permitted. No case submitted at the April term has claimed more of our attention, or been more thoroughly examined, than the one to which this motion refers, and upon the review made we feel entirely satisfied with the result reached, and

The motion must therefore be denied with costs.

The other Justices concurred.